**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

National Association of Convenience Stores
1600 Duke Street, 7th Floor
Alexandria, VA 22314

National Retail Federation
1101 New York Ave N.W., Suite 1200
Washington, DC 20005

Retail Litigation Center, Inc.
99 M Street S.E., Suite 700
Washington, DC 20003

Food Marketplace, Inc. d/b/a FMI – The Food Industry Association
251 18th St. S, Suite 1200
Arlington, VA 22202

Restaurant Law Center
2055 L Street N.W., Suite 700
Washington, DC 20036

National Grocers Association
601 Pennsylvania Ave, N.W. Suite 375N
Washington DC 20004

Illinois Retail Merchants Association
216 Broadway
Springfield, IL 62701

Illinois Fuel & Retail Association
112 W. Cook St.
Springfield, IL 62704

Illinois Restaurant Association
33 W. Monroe, Suite 250
Chicago, IL 60603

*Plaintiffs*,

v.

John Crews, *in his official capacity as Chair-*

Civil Action No. __________

*man of the National Credit Union Administration*, and the National Credit Union Administration
1775 Duke St.,
Alexandria, VA 22314-3428

*Defendants*.

**COMPLAINT**

1. Every time a consumer pays a merchant with a Visa or Mastercard, the merchant is charged a fee (called an interchange fee) that is set by the credit card network and received by the financial institution issuing the card. Interchange fees in the United States are the highest in the world, often 10 times the fees in Europe. Most of the interchange fee is set as a percentage of the overall transaction amount. These fees cost merchants hundreds of billions of dollars a year, and they inflate the retail prices that consumers pay. After Illinois passed a law prohibiting card networks from establishing an interchange fee on the tax and gratuity portion of a transaction—amounts that merchants collect on behalf of and fully pass onto others—financial institutions challenged the law as preempted by the Federal Credit Union Act. A federal district court rejected that challenge. Years into the litigation, the National Credit Union Administration ("NCUA") promulgated an interim final rule purporting to change the outcome.

2. Plaintiffs National Association of Convenience Stores, National Retail Federation, Retail Litigation Center, Food Marketplace, Inc. d/b/a FMI – The Food Industry Association, Restaurant Law Center, National Grocers Association, Illinois Retail Merchants Association, Illinois Fuel & Retail Association, and Illinois Restaurant Association (collectively, "Plaintiffs") challenge the interim final rule issued by Defendant NCUA, titled Preemption—Federal Credit Union Non-Interest Charges and Fees, 91 Fed. Reg. 34,725 (June 9, 2026) ("Interim Rule").

3. NCUA issued the Interim Rule without notice and comment. The Interim Rule purports to determine that the Federal Credit Union Act protects federal credit unions' ability to receive interchange fees established by payment card networks, even when those fees are set centrally and non-competitively by the networks rather than by the financial institutions themselves, are charged to merchants and not credit union members, and are much higher than the amount necessary to compensate financial institutions for their highly profitable credit card practices. But nothing in the Federal Credit Union Act—or in the NCUA's poorly reasoned, slapdash rule—authorizes such collusive and excessive fees on merchants that are not being provided credit union services in exchange for those fees.

4. Visa and Mastercard require merchants to accept cards from every financial institution if they accept cards from any institution in the network. Given that over eighty percent of all card transactions occur on one of these two networks, merchants have little choice but to accept every Visa and Mastercard, no matter how high an interchange fee any institution on those networks imposes. Credit unions thus simply adopt the excessive default fees set by the card networks. Merchants even must pay these high fees on taxes and tips—amounts merchants collect on behalf of, and pass on completely to, others (i.e., their employees and the government). In other words, the merchants pay fees for these portions of every transaction, even though they, of course, make no revenue from taxes or tips.

5. American consumers also bear those costs through higher retail prices, while card networks and issuing financial institutions reap immense profits from the fees. In 2025 alone, the card networks and their issuing financial institutions collected $198 billion in U.S. credit and debit card merchant fees, increasing costs to the average American family by an estimated additional

$1,200 per year. *See* Bridget Goldschmidt, *Swipe Fees Reach Record $198.25B*, Progressive Grocer, March 19, 2026.

6. Against this backdrop, Illinois passed the Interchange Fee Prohibition Act ("IFPA") in 2024 to try to redress one discrete, but fundamentally unfair, aspect of the modern payments system—the collection of interchange fees on applicable taxes and tips. 815 ILCS § 151/150-1 *et seq.* The IFPA eliminates this unfairness by prohibiting certain entities from "receiv[ing] or charg[ing] a merchant any interchange fee on the tax amount or gratuity of an electronic payment transaction." 815 ILCS § 151/150-10(a). The IFPA's limitation applies only when a card network (as opposed to the card-issuing financial institution itself) sets the fee. 815 ILCS § 151/150-5, -10(a). In contrast, if a credit union were to set its own interchange fee amount on taxes and tips then it would be exempt from the IFPA interchange fee requirement. *See id.*

7. America's Credit Unions and several other financial associations ("the Credit Unions") moved swiftly to try to enjoin the IFPA, arguing that the IFPA was preempted by the Federal Credit Union Act, 12 U.S.C. § 1757 *et seq. See Illinois Bankers Association et al. v. Raoul*, No. 24-cv-7307 (N.D. Ill.) Dkt. 1. The district court denied the Credit Unions' preliminary injunction motion as applied to credit unions, and later denied their summary judgment motion, holding that the Federal Credit Union Act did not preempt the IFPA. *Id.* Dkt. 115, Dkt. 179 ("*Raoul* MSJ Order"). At that time, the law was set to go into effect in July 2026.

8. The Credit Unions appealed to the U.S. Court of Appeals for the Seventh Circuit. *See Illinois Bankers Association, et al. v. Raoul*, Seventh Circuit No. 26-1354. But while the appeal was pending, the Office of the Comptroller of the Currency ("OCC") issued an interim final rule and interim final order in support of the Credit Unions' co-plaintiff banks, purporting to preempt

the IFPA as applied to national banks under the National Bank Act. On that basis, the Seventh Circuit remanded the case to the district court for further consideration. *Id.* Dkt. 104.

9. Following the Seventh Circuit's remand, and two years after the enactment of the IFPA, NCUA promulgated the Interim Rule to address the IFPA. NCUA did so without notice and comment, claiming that such process was "impracticable." 91 Fed. Reg. 34,728. The Interim Rule directly references OCC's "similar" rule, and states that it is "adopting language that is substantially similar" to that of OCC. 91 Fed. Reg. 34,726. NCUA's Interim Rule stated that the Federal Credit Union Act preempted the IFPA. *Id.*

10. The Credit Unions immediately informed the court about the Interim Rule. *Raoul*, No. 24-cv-7307 (N.D. Ill.) Dkt. 224. The court held that it was unable to evaluate a challenge to the validity of the rule for failure to comply with the APA, held that the Interim Rule (if valid) preempted the IFPA as applied to credit unions, and reversed its earlier ruling, permanently enjoining enforcement of the IFPA as applied to credit unions. *Id.* Dkt. 240 ("*Raoul* Perm. Inj. Order"). The Illinois General Assembly's effort to provide minimal relief to consumers from paying interchange fees on taxes and tips remains enjoined today.[1]

11. The Interim Rule exceeds NCUA's authority under the Federal Credit Union Act because the NCUA lacks the authority to grant credit unions the power to charge unlimited interchange fees on merchants and lacks preemptive authority under the statute, and its reasoning is arbitrary and capricious because it failed to address or consider any facts or arguments other than those of banks and credit unions, thus violating the Administrative Procedure Act. 5 U.S.C.

[1] The Illinois General Assembly initially set a July 1, 2025, effective date for the IFPA, but in June 2025 the General Assembly moved that date to July 1, 2026. *See* Illinois Public Act 104-4, § 5. Then, the IFPA was enjoined in the *Raoul* litigation. Afterwards, the General Assembly delayed implementation of the IFPA to July 1, 2027. *See* Illinois Public Act 104-0532.

§ 706(2)(A), (C) (prohibiting agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and those that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"). In addition, NCUA promulgated the Interim Rule without observing the fundamental procedures required by law, including foregoing notice and comment without good cause, and as such the Interim Rule violates the Administrative Procedure Act.

12. Plaintiffs respectfully ask this Court to declare that the Interim Rule violates the Administrative Procedure Act, and to vacate and set aside the action.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law. Specifically, Plaintiffs' claims arise under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA").

14. Venue is proper under 28 U.S.C. § 1391(e)(1) because an agency of the United States is a Defendant, and several Plaintiffs—National Retail Federation, Retail Litigation Center, Inc., Restaurant Law Center, and National Grocers Association—reside in the District of Columbia.

15. This Court is authorized to award the requested relief under 5 U.S.C. § 706; 28 U.S.C. §§ 1651, 2201, and 2202; and its inherent equitable powers.

16. Sovereign immunity is waived by statute. 5 U.S.C. § 702.

17. Plaintiffs have exhausted all administrative remedies and have no other adequate remedy available at law.

## PARTIES

18. Plaintiff NATIONAL ASSOCIATION OF CONVENIENCE STORES ("NACS") is a trade association dedicated to advancing both the convenience and fuel retailing industries, including serving as a voice for its members on combatting unnecessary or unlawful costs such as inflated credit card swipe fees. Its members include over 1,300 retail merchants and over 1,600 suppliers, many of whom operate in the State of Illinois. The U.S. convenience store industry has more than 152,000 stores across the country selling fuel, food, and merchandise; they accept 160 million customer transactions daily and have annual sales of over $906 billion. Many of their sales are card purchases that are subject to tax and/or tips. NACS is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule.

19. Plaintiff NATIONAL RETAIL FEDERATION ("NRF") is a trade association whose members include over 17,000 merchants across the diverse retail industry, including department stores, restaurants, grocery stores, Internet retailers, and others. For over a century, NRF has been a voice for every retailer and every retail job, including advocating for swipe fee reform to increase transparency and reduce swipe fees for merchants. Among other things, NRF advocates for policies that will benefit the retail industry and provides a professional network for thousands of industry representatives. Many of NRF's members operate in the State of Illinois, and many of their sales are card purchases that are subject to tax and/or tips. NRF is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule.

20. Plaintiff RETAIL LITIGATION CENTER, INC. is a trade association that represents national and regional retailers, including many of the country's largest and most innovative

retailers, across a breadth of retail verticals. The Retail Litigation Center is dedicated to representing the retail industry in the courts, including on issues involving exorbitant, unlawful, and unreasonable swipe fees. The Retail Litigation Center's members employ millions of people throughout the United States, provide goods and services to tens of millions more, and account for hundreds of billions of dollars in annual sales. The Retail Litigation Center offers retail-industry perspectives to courts on important legal issues and highlights the industry-wide consequences of significant cases. Many of the Retail Litigation Center's members operate in the State of Illinois, and many of their sales are card purchases that are subject to tax and/or tips. The Retail Litigation Center is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule.

21. Plaintiff Food Marketplace, Inc. d/b/a FMI – THE FOOD INDUSTRY ASSOCIATION, is a trade association representing members in the food industry across the entire consumer food supply chain—from the producers that supply food to the retailers that sell it. FMI's members range from small independent operators to the largest national and international food businesses. The reach of FMI's work is significant and represents a $1 trillion industry with over six million employees. Its members include over 40,000 retail food stores and 25,000 pharmacies. FMI advocates for policies in federal and state governments that will benefit the food industry, including on threats to the food industry such as soaring swipe fees. Many of FMI's members operate in the State of Illinois, and many of their sales are card purchases that are subject to tax and/or tips. FMI is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule.

22. Plaintiff RESTAURANT LAW CENTER is the only independent public policy organization created specifically to represent the interests of the food service industry in the courts.

The industry is comprised of over one million restaurants and other foodservice outlets that represent a broad and diverse group of owners and operators—from large national outfits and franchisors with hundreds of locations and billions in revenue, to small single-location, family-run neighborhood restaurants and bars, including restaurants in Illinois. It represents a labor-intensive industry comprised of over one million restaurants and other food-service outlets employing about 16 million people, including locations in Illinois, and is the nation's second largest private-sector employer. Through amicus participation and first party litigation, the Restaurant Law Center serves as the industry's voice in the judicial system and offers courts and regulatory agencies with the industry's perspective on significant legal and regulatory issues to ensure that the views of America's and state restaurant associations, including Illinois' restaurants, are taken into consideration. It advocates on behalf of its member organizations on a variety of topics, including on the topic of processing credit card transactions, which now is the third-largest operating expense, behind food and labor. Many sales are card purchases on payments that are subject to tax and/or tips, including for members in Illinois. The Restaurant Law Center is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule.

23. Plaintiff NATIONAL GROCERS ASSOCIATION is a national trade association. It represents the retail and wholesale grocers that comprise the independent sector of the food distribution industry, as well as affiliated associations, manufacturers, and service suppliers. Its mission is to champion the independent grocery industry through advocacy, collaboration, education, services, and connections, including on topics like swipe fee costs for which small businesses like grocery stores pay almost double what large businesses pay, and which is their only cost that is non-negotiable. To that end, it offers advocacy, support, and resources to over 1,700 independent supermarket operators, including in the State of Illinois. Many of their sales are card purchases on

payments that are subject to tax and/or tips. The National Grocers Association is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule.

24. Plaintiff ILLINOIS RETAIL MERCHANTS ASSOCIATION ("IRMA") represents Illinois retailers statewide and fights for the best possible environment in which to do business in Illinois. One out of every four people in Illinois works in the retail industry; retail thus serves as a driving force of Illinois's economy. IRMA provides advocacy services and representation to Illinois retailers and engages with retailers, the public, lawmakers, and the media on the impact of legislative and regulatory proposals on Illinois retail. IRMA has fought to reduce swipe fees, including on taxes and tips, and advocates against the duopoly of Visa and Mastercard that currently can raise these fees without oversight, harming consumers and retailers as they continue to grapple with inflation. IRMA worked with Illinois lawmakers to pass the IFPA. IRMA is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule.

25. Plaintiff ILLINOIS FUEL & RETAIL ASSOCIATION ("IFRA") is a trade association that serves as a voice for petroleum distributors and convenience store businesses in Illinois. IFRA is made up of businesses ranging from small family-run establishments to publicly traded international corporations, representing primarily petroleum marketers and convenience stores. Its members sell over 10 billion gallons of fuel every year, for which its members are subject to over $2 billion in Illinois state fuel taxes alone. IFRA advocates for policies that will help its members and their customers, including advocating for the elimination of swipe fees on taxes and tips. Many of IFRA's members for whom IFRA advocates will continue to be injured by paying interchange

fees on taxes and tips in the absence of the IFPA. IFRA is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule.

26. Plaintiff ILLINOIS RESTAURANT ASSOCIATION ("IRA") is a non-profit trade organization founded over one hundred years ago to promote, educate, and improve the restaurant industry in Illinois. Headquartered in Chicago, the Association has nearly 8,000 participants statewide—including restaurant operators, food service professionals, suppliers, and related industry professionals—and represents the Illinois restaurant industry, which includes more than 25,000 owners and operators, and employs hundreds of thousands across the state. The Association supports the restaurant industry by promoting local tourism, providing food service education and training programs, providing analysis on topics of the day, providing networking opportunities, hosting culinary events, and advocating for members' interests. Many of IRA's members for whom IRA advocates will continue to be injured by paying interchange fees on taxes and tips in the absence of the IFPA. IRA is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule.

27. Plaintiffs and their members all accept Visa and Mastercard transactions since those card networks dominate credit and debit card payments in the United States. Merchants are required to pay interchange fees on Visa and Mastercard card transactions as a condition of accepting credit- and debit-card payments, and those fees are retained by the financial institutions (including credit unions) issuing credit and debit cards. In 2025 alone, U.S. merchants paid more than $198 billion in swipe fees. J. Craig Shearman, *Credit and Debit Card 'Swipe' Fees Reach Record $198.25 Billion as President and Congress Call for Action*, Merchants Payments Coalition (Mar. 18, 2026), https://perma.cc/99LL-C65N. In the absence of the IFPA, merchants are also forced to

pay interchange fees on taxes and tips for which they have no corresponding revenue, further increasing their overall card acceptance costs.

28. The IFPA would have provided a substantial benefit to Plaintiffs and their members because it would have relieved them of the burden of paying interchange fees on taxes and tips—to the tune of hundreds of millions of dollars. The Interim Rule revises NCUA regulations and purports to "clarify" that the Federal Credit Union Act preempts the IFPA. Thus, NCUA's action purports to empower credit unions to continue to receive many millions of dollars more in interchange fees in Illinois from Plaintiffs and their members.

29. The most recent estimate is that Illinois merchants pay upwards of $242 million in interchange fees on taxes and tips alone every year. Illinois Fuel and Retail Association, *Swipe Fees on Taxes and Tips – Methodology*, available at: https://tinyurl.com/4mpzuwcx.

30. Plaintiffs also have a broader interest in their members not being charged excessive interchange fees established by non-financial-institution payment card companies, including on funds that merchants collect but do not retain, such as taxes and tips, and in safeguarding the ability of States like Illinois to protect the interests of merchants and consumers from such economically harmful practices. The Interim Rule casts significant doubt on the ability of states like Illinois to pass legislation that relieves merchants and consumers of these substantial financial burdens and thus will chill other States from doing so.

31. NCUA furthermore failed to follow procedures required by law when it issued the Interim Rule. NCUA's failure to abide by those procedures deprived Plaintiffs and their members of the procedural right to protect their interests through notice and comment. Because NCUA elected to proceed without notice and comment, Plaintiffs lost their right to attempt to persuade

NCUA to change course before it issued the Interim Rule. These procedural injuries would be redressed by the relief sought.

32. Defendant JOHN CREWS, the Chairman of the NCUA, is the highest-ranking member of NCUA. In that capacity he has ultimate responsibility for the administration and implementation of the Federal Credit Union Act and compliance with the APA, and for compliance with all other federal laws applicable to NCUA. The Chairman is sued in his official capacity.

33. Defendant NCUA is an independent federal agency that promulgated the challenged Interim Rule.

**STATUTORY BACKGROUND**

34. The Illinois Interchange Fee Prohibition Act ("IFPA"), 815 ILCS § 151/150-1 *et seq.*, prohibits "any interchange fee on the tax amount or gratuity of an electronic payment transaction," 815 ILCS § 151/150-10(a), that is "established, charged, or received by a payment card network," 815 ILCS § 151/150-5.

35. The IFPA applies to all credit and debit card transactions in Illinois. It applies only to fees set by card networks, not to fees set by the card-issuing financial institution itself. It regulates fees imposed on merchants accepting card transactions; it does not regulate fees imposed by credit unions on their members. It regulates the choice of the card networks, like Visa and Mastercard, to use their dominant market power to include in the interchange fee calculation the transaction amounts attributable to tax and tip, which merchants have little choice but to accept because of the anticompetitive card network rules.

36. The Federal Credit Union Act, 12 U.S.C. §§ 1757 *et seq.*, regulates a different set of activities. It authorizes federal credit unions to make contracts and loans, to issue lines of credit "to its members, to other credit unions, and to credit union organizations and to participate with

other credit unions, credit union organizations, or financial organizations in making loans to credit union members," and "to exercise such incidental powers as shall be necessary or requisite to enable it to carry on effectively the business for which it is incorporated." 12 U.S.C. §§ 1757(1), (5), (17).

37. NCUA is a federal agency that can make "rules and regulations for the administration of" the Federal Credit Union Act. 12 U.S.C. § 1766(a). Nothing in the NCUA's authorizing legislation grants the NCUA the power to preempt State laws.

38. The Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, governs the substantive and procedural requirements for agency decision-making, including the rulemaking and adjudication process.

39. A court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). That is because "[f]ederal agencies" are "creatures of statute and as such literally have no power to act except to the extent Congress authorized them." *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 911-12 (D.C. Cir. 2024) (cleaned up).

40. Under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted) ("*State Farm*"). A "reviewing court shall . . . hold unlawful and set aside" agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

41. An agency action is arbitrary and capricious under the APA where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

42. The APA requires that "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" before it issues a rule. 5 U.S.C. § 553(c).

43. An agency may only dispense with the APA's notice and comment requirements in a rulemaking if it finds, "for good cause," that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). The impracticability exception is "to be narrowly construed and only reluctantly countenanced." *Mack Trucks, Inc. v. E.P.A.*, 682 F.3d 87, 93 (D.C. Cir. 2012). This exception applies only where, for example, delay would "imminently threaten life or physical property." *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 706 (D.C. Cir. 2014).

44. The APA confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Financial Institutions and Networks Charge Supracompetitive Interchange Fees

45. On every retail credit and debit card purchase involving a Visa or Mastercard-branded card, the card network company, Visa or Mastercard, centrally sets an interchange fee that is charged to merchants and collected by financial institutions that issue the credit and debit cards. Whenever a customer pays a merchant with a credit or debit card, the customer's card information is sent through the card network to the customer's issuing institution, which approves or declines the purchase. Following approval, the card network moves the funds from the issuing financial

institution to the merchant's bank to settle the sale, but the merchant does not receive the entire amount. Instead, every transaction incurs several fees, including an interchange fee. The issuing institution retains the interchange fee. The merchant then receives the cost of purchase minus the fees. Thus, the merchant bears the interchange fee as part of the cost of accepting the transaction, while the fee is paid to the cardholder's issuing financial institution. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 1014159, at *4-*5 (E.D.N.Y. Mar. 8, 2024).

46. For merchants, many of whom operate on thin margins, interchange is a significant and unavoidable cost of accepting card payments, and that cost is ultimately reflected in the prices consumers pay. American consumers thus are stuck with the bill for the interchange fees while the issuing banks receive immense profits.

47. The card issuing institutions collect hundreds of billions of dollars annually from these interchange fees, increasing costs to the average American family by an estimated $1,200 per year. *See* Goldschmidt, *Swipe Fees Reach Record $198.25B*, *supra* ¶ 27.

48. Card networks like Visa and Mastercard, not financial institutions, set the interchange fees and impose "network rules" that "work[] in tandem" to "allow the issuing banks to impose an artificially inflated interchange fee that merchants have little choice but to accept." *In re Payment Card Interchange Fee*, 827 F.3d 223, 228 (2d Cir. 2016). For example, the card networks' rules require merchants to honor all cards from every financial institution in those respective brands regardless of interchange rate, leaving the networks "free to set interchange fees at a supra-competitive rate" and giving "the issuing banks[] little incentive to deviate from it." *Id.* at 228-29. Thus, the issuing institutions, including credit unions, do not set the interchange fees themselves, but instead accept any default fee set by the card networks, and then profit massively from

the collusive deal that prevents any need for competition among financial institutions on merchant fees. The fee-setting by card networks combined with the requirement to take all cards deprives the payment card market of competition on price that is the hallmark of other markets in the United States.

49. The result is that interchange fees in the United States are among the highest in the world. In contrast to the 30-basis-point (0.30%) cap in the European Union and the United Kingdom, where issuers still operate profitably, Visa and Mastercard typically set their United States interchange rates "between 200 and 300 basis points." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *28, *41 (E.D.N.Y. June 28, 2024) (citations omitted). American families then must foot the bill.

50. Every year, U.S. merchants pay hundreds of billions of dollars in these artificially inflated fees on debit and credit card transactions. In 2025 alone, credit and debit card merchant fees totaled over $198 billion. *See* Goldschmidt, *Swipe Fees Reach Record $198.25B*, *supra* ¶ 27. For many merchants, aggregate interchange fees exceed all operating costs except labor costs. *See* Merchants Payments Coalition, *Merchants Welcome Unions' Call to Pass Credit Card 'Swipe' Fee Reform* (Jan. 29, 2026), https://perma.cc/P5VR-L9S7. Merchants operating on thin margins cannot absorb these fees, so American consumers end up having to pay more while the issuers receive immense profits.

## II. IFPA's Enactment and Resulting Litigation

51. In June 2024, the State of Illinois enacted the Illinois Interchange Fee Prohibition Act, 815 ILCS § 151/150-1 *et seq.* The IFPA prohibits any entity from charging "interchange fees" on the "tax amount or gratuity of an electronic payment transaction," 815 ILCS § 151/150-10(a),

but only when that interchange fee is "established, charged, or received by a payment card network," 815 ILCS § 151/150-5.[2] Although originally intended to go into effect in July 2025, the IFPA's effective date was subsequently delayed to July 1, 2026, and then to July 1, 2027, following the litigation described below.

52. Soon after the State passed the IFPA, the Credit Unions and other financial institution associations sued the Attorney General of Illinois seeking to enjoin its enforcement. *Illinois Bankers Association et al. v. Raoul*, No. 1:24-cv-07307 (N.D. Ill.). The Credit Unions argued that Federal Credit Union Act preempted the IFPA. *See id.* Dkt. 1. The district court denied a preliminary injunction of the IFPA as applied to credit unions, explaining that although the Federal Credit Union Act "identifies specific aspects of the relationship between credit unions and their members that states cannot regulate," the Act "does not appear to implicate the substance of what the IFPA is regulating." *Id.* Dkt. 115 at 5. And although the court initially granted a preliminary injunction on the basis that the IFPA was preempted by the National Bank Act as applied to national banks (but not credit unions), *id.* Dkt. 104, upon closer review at summary judgment it held that neither the National Bank Act nor the Federal Credit Union Act preempted the IFPA. *Raoul* MSJ Order.

53. The district court explained that the Federal Credit Union Act did not preempt the IFPA because "neither provision of the IFPA conflicted with Plaintiffs' proposed express and incidental federal credit union powers to such an extent that the State law could not still stand." *Raoul* MSJ Order at 31-32. The Credit Unions also did not receive "special preemption" analysis under the standard applicable to national banks based merely on the Credit Unions' "gestures at other federal entities" that received that standard. *Id.* at 32. Besides, even if the national-bank

---

[2] The IFPA also contains a Data Usage Limitation provision. 815 ILCS § 151/150-15(b). That provision is not relevant to this Complaint.

preemption standard applied, the district court held that no statute, regulation, or other source establishes that receiving anticompetitive interchange fees is part of the "business of banking." *Raoul* MSJ Order at 19-20. And the district court explained that the Federal Credit Union Act's regulations "addressing 'closing costs, application, origination, or other fees' does not appear to implicate the substance of the Interchange Fee Provision." *Id.* at 33 (citing 12 C.F.R. § 701.21(b)(1)(i)(C)).

54. The Credit Unions appealed the district court's denial of summary judgment. *See Illinois Bankers Association, et al. v. Raoul*, Seventh Circuit No. 26-1354. Between March 2, 2026, and April 17, 2026, the Appellants, Appellees, and respective *amici*—including some of the Plaintiffs here, Dkt. 68—filed opening, response, and reply briefs on the merits. *See id.* But before a decision by the Seventh Circuit, OCC filed a Rule 28(j) letter stating that it was promulgating an interim final rule and interim final order, both of which would have "significant effects on the questions presented" and would become effective "the day before the IFPA is set to become effective." *Id.* Dkt. 84-1 at 1-2; *see* National Bank Non-Interest Charges and Fees, 91 Fed. Reg. 22,989 (Apr. 29, 2026); Order Preempting the Illinois Interchange Fee Prohibition Act, 91 Fed. Reg. 23,150 (Apr. 29, 2026).

55. The Seventh Circuit remanded the case to the district court in light of OCC's actions, *Raoul*, Seventh Circuit No. 26-1354 Dkt. 104, and the district court reversed its ruling and permanently enjoined enforcement of the IFPA as applied to national banks based on its view that the OCC's interim actions preempted the IFPA. The district court also held that it could not rule on the challenges to the validity of OCC's actions given the posture of that case as a suit challenging the IFPA as preempted, because it believed a court "cannot grant an APA claim that does not exist, nor any other claim unpleaded." *Raoul*, No. 1:24-cv-7307 (N.D. Ill.), Dkt. 223 at 8.

## III. NCUA Joins OCC and Intervenes on Behalf of the Credit Unions in IFPA Litigation by Promulgating the Interim Rule

56. One week after OCC's interim actions caused the court to reverse its rulings regarding national banks, NCUA elected to intervene in favor of the Credit Unions and card networks in the Illinois litigation. NCUA promulgated the Interim Rule, stating that it was "similar" to the interim final rule and interim final order that OCC recently had promulgated, using "language that is substantially similar," to effect preemption of the IFPA under the Federal Credit Union Act. 91 Fed. Reg. 34,726.

57. NCUA made no effort to comply with the APA's notice-and-comment provisions, relying entirely on the spurious and unsupported notion that notice and comment would be "impracticable" for this Interim Rule. 91 Fed. Reg. 34,728.

58. NCUA's Interim Rule addresses the agency's position on the power of federal credit unions to charge non-interest fees. The Interim Rule creates 12 C.F.R. § 701.5(c), which provides that federal credit unions "may charge non-interest charges and fees, including share account service charges and interchange fees from credit and debit card operations." 91 Fed. Reg. at 34,732. The Interim Rule also purports to "clarify" that its authority to regulate rates, repayment terms, and other credit union loan conditions "is not limited to charges directly to members." *Id.* at 34,727. NCUA claims that its Interim Rule "is intended to preempt any state law affecting the noninterest charges and fees related to payment card services, including the IFPA." *Id.*

59. The Credit Unions immediately informed the court about the Interim Rule. *Raoul*, No. 24-cv-7307 (N.D. Ill.) Dkt. 224.

60. Thereafter, the district court reconsidered its decision upholding the IFPA as applied to credit unions in light of the NCUA's actions. The district court reversed its prior ruling and permanently enjoined enforcement of the IFPA as applied to credit unions based on the Interim

Rule. *Id.* Dkt. 240 ("*Raoul* Perm. Inj. Order"). The court recognized that Illinois argued that NCUA's interim rule violated required procedures, but the court observed that it "cannot grant an APA claim that does not exist, nor any other claim unpleaded" based on the posture of that case, and that the question before it was "one of constitutionality and other questions of statutory interpretation" and "not" one of "APA . . . compliance." *Raoul* Perm. Inj. Order at 8.

61. Believing it could not review challenges to the Interim Rule unless a new lawsuit was filed under the APA, the court evaluated only the merits of the preemption claims before it. It observed that NCUA's actions stood on "shakier ground," because "§ 1757(5) allows a federal credit union to 'extend lines of credit *to its members*,'" which is "exactly the operative phrase that the [Interim Rule] struck." *Raoul* Perm. Inj. Order at 10 (emphasis in original). The court also observed that "where this provision may do work in bulking up the agency's authority, it does not resolve for a textual divergence from the authorizing statute." *Id.* But on the limited question of whether the Interim Rule (if valid) preempts the IFPA, the court held that it does. *Id.* at 9-12. The court thus entered a permanent injunction against enforcement of the IFPA as to federal credit unions.

62. The U.S. District Court for the Northern District of Illinois entered its combined permanent injunction on September 28, 2026, alongside a stipulation of final judgment subject to reservation of right to appeal. Dkts. 242, 243. The Illinois Attorney General appealed the court's combined permanent injunction on October 9, 2026, seeking to reverse the grant of injunctive relief. Dkt. 244.

63. No APA claim exists in that case based on that case's posture: the Credit Unions' challenge to the IFPA as preempted by federal law.

64. Accordingly, Plaintiffs bring this APA challenge to NCUA's Interim Rule.

## FIRST CAUSE OF ACTION

### Violation of the APA: Interim Rule is Contrary to Law and Exceeds Statutory Authority

65. The allegations in paragraphs 1–64 are expressly incorporated herein as if restated in full.

66. NCUA must act only within its statutory authority and in accordance with federal law, because "an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519 (2009) (refusing to hold certain state actions preempted by OCC regulation because the regulation exceeded OCC's authority and unreasonably interpreted the statute under *Chevron*).

67. The Interim Rule is based on a flawed legal interpretation of NCUA's powers, of federal credit union powers, and of preemption under the Federal Credit Union Act, making it "in excess of statutory . . . authority" and "short of statutory right." 5 U.S.C. § 706(2)(C).

68. Nothing in the Federal Credit Union Act grants credit unions the power either to receive fees centrally set by card networks or to charge fees to entities like merchants, who are not credit union members. After all, the statutory provision that NCUA relies upon in the new 12 C.F.R. § 701.5(b) is limited to empowering credit unions "to make loans . . . and extend lines of credit *to its members*, to other credit unions, and to credit union organizations." 12 U.S.C. § 1757(5) (emphasis added). NCUA thus exceeded its statutory authority when it removed the reference to "members" in its regulations—despite the statute's explicit use of that term—and purported to grant authority to credit unions to impose "interchange fees from credit and debit card operations." 91 Fed. Reg. 34,725, 34,727. Nothing in the Act empowers credit unions to charge

such fees, much less unlimited fees that are not subject to market competition on rates, not necessary to compensate credit unions for their lending and deposit-taking activities, and not subject to any state regulation.

69. The receipt of such non-competitive fees is a windfall rather than a Congressionally protected credit union power. Indeed, the Interim Rule itself inadvertently highlights that distinction by explaining that it protects "business decisions" that federal credit unions make "regarding non-interest charges and fees *on a competitive basis and not on the basis of any agreement*, arrangement, undertaking, understanding, or discussion with other financial institutions or their officers." 91 Fed. Reg. 34,728 (emphasis added). Interchange fees in the United States are not independently established by financial institutions through competitive decision-making; they are centrally established by card networks and accepted by issuers.

70. Moreover, nothing in the Federal Credit Union Act empowers NCUA to preempt state law in this area. The lack of preemptive power is meaningful because Congress knows how to allow agencies to preempt State law when it so chooses. Indeed, Congress chose to allow preemption under one area of the Federal Credit Union Act: § 1785(g)(1) gives insured credit unions the power to charge certain interest rates on loans "notwithstanding any State constitution or statute which is hereby preempted for the purposes of this subsection[.]" Thus the Federal Credit Union Act itself explicitly preempts in one area, but not in the area on which NCUA relies. And in further contrast, the National Bank Act—to which NCUA cites in its Interim Rule, 91 Fed. Reg. 34,727 n.24—lays out an explicit "preemption standard" that applies to some of its provisions, 12 U.S.C. § 25b. That Congress declined to provide an express preemption clause in the Federal Credit Union Act, and declined to provide any preemptive power to the agency in the area in which NCUA seeks to exercise it here, settles the point. Courts cannot read a preemption provision that

Congress did not write into the Federal Credit Union Act and agencies cannot give themselves preemptive power that Congress chose to withhold.

71. NCUA attempts to evade its lack of Congressionally granted preemptive power by stating that it "has broad power to issue regulations governing" federal credit unions, and that it issued its rule purporting to preempt the interchange fee prohibition under this "general regulatory authority." 91 Fed. Reg. at 34,727. But those phrases are a non-sequitur, particularly given that 12 U.S.C. § 1766(a), on which NCUA relies, provides only that NCUA "may prescribe rules and regulations for the administration of" the statute. Congress declined to grant preemptive power by statute; this language does not create one.

72. The Interim Rule thus is contrary to law and exceeds statutory authority.

73. NCUA's actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Violation of the APA: Interim Rule Is Arbitrary or Capricious

74. The allegations in paragraphs 1–64 are expressly incorporated herein as if restated in full.

75. The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

76. To that end, the APA requires that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43.

77. Thus, an agency action is arbitrary and capricious under the APA where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

78. The Interim Rule is arbitrary and capricious.

79. NCUA's determinations in the Interim Rule do not rely on any robust rulemaking record because NCUA unjustifiably skipped the administrative process. Instead, NCUA relies on the Credit Unions' arguments in the *Raoul* litigation (which do not support preemption) and second-hand speculation.

80. NCUA relies on bank-regulation-related "reasoning" that it says "applies equally" to credit unions. 91 Fed. Reg. 34,727. But NCUA offers no basis to believe that the reasoning would apply equally, especially in light of substantive differences between the National Bank Act and the Federal Credit Union Act. Indeed, NCUA's effort to explain away some of those issues in a footnote proves the point. *Id.* n.24 (tacitly admitting that "the receipt of fees related to credit card and debit card transactions is not considered directly authorized under the FCU Act"). Nor, for that matter, would the preemption provision of the National Bank Act be analyzed similarly to the nonexistent preemption provision of the Federal Credit Union Act.

81. Worse, although the NCUA relies on the arguments made by the plaintiff financial institutions in the *Raoul* litigation, NCUA wholly ignores contrary evidence and arguments presented in the *Raoul* litigation before issuing its Interim Rule. For example, NCUA does not address contentions by the Illinois Attorney General, Plaintiffs as *Amici*, and others that (1) the IFPA will not significantly interfere with financial institution powers because compliance is feasible as a routine update to network technical standards; (2) the bulk of the compliance burden falls on mer-

chants, processors, and card networks, not on financial institutions; (3) card networks already calculate variable interchange rates across hundreds of jurisdictions globally; (4) interchange fees vastly exceed processing costs so financial institutions can still profit handsomely from interchange fees under the IFPA; (5) financial institutions operate profitably under far more restrictive interchange regimes globally; and (6) market-exit predictions came from state-chartered institutions, not federally chartered financial institutions. *See*, *e.g.*, *Raoul*, No. 26-1354 (Seventh Circuit) Dkt. 61 at 4-7; Dkt. 68 at 4, 14-22; No. 1:24-cv-07307 (N.D. Ill.) Dkt. 135-1 at 2, 8-11; *see also State Farm*, 463 U.S. at 43. NCUA did not consider these arguments when issuing its Interim Rule, and thus the Interim Rule is arbitrary and capricious.

82. NCUA's Interim Rule does not rely on any factual premises within its expertise; it relies instead on the supposed "complex and potentially unworkable nature of the interchange fee prohibition," for which it cites primarily declarations from the banks and Credit Unions. 91 Fed. Reg. at 34,729-30 & nn.47, 48, 49, 50, 52, & 57. That evidence, in turn, is anecdotal and speculative; it provides no concrete basis to conclude that the Credit Unions' concerns will be common or result in systemic consumer harm.

83. For example, stretching to reach its conclusion, the Interim Rule assumes that financial institutions have no alternative compensation for their credit and debit activities beyond network-set interchange fees based on the false premise that bilateral fee negotiation between institutions and merchants is unworkable. 91 Fed. Reg. 34,725. NCUA cites nothing for this proposition, and it defies economics and experience. *See*, *e.g.*, Nicholas Economides, *Competition Policy Issues in the Consumer Payments Industry* 122 *in* R. Litan & M. Baily, *Moving Money: The Future of Consumer Payment*, Brookings Institution (2009) available at https://perma.cc/6B6E-

22PQ. Contrary to NCUA's core assumption, financial institutions could set their own fees. NCUA's resultant preemption conclusion is incorrect.

84. What is more, to reach that conclusion, NCUA relies on the plaintiffs' declarations from the *Raoul* litigation that argue that compliance with the IFPA will be technically difficult for the networks and acquirers. *See*, *e.g.*, 91 Fed. Reg. 34,729 n. 44, n. 47-51. But NCUA entirely ignores and does not weigh opposition declarations in the very same litigation, and other counter-arguments put forward by the State of Illinois and its *amici*, arguing that technical compliance would easily be feasible. *See*, *e.g.*, No. 1:24-cv-07307 (N.D. Ill.) Dkts. 135-1, 216. NCUA did not consider these counterarguments when issuing its Interim Rule, and thus the Interim Rule is arbitrary and capricious.

85. The Interim Rule preamble's claim that its revised regulation preempts state interchange fee regulations, including the IFPA, is also arbitrary and capricious and misinterprets the agency's own revised regulation. The two subsections in § 701.5 that contain preemption clauses, (a) and (b), involve topics that do not cover the IFPA: share accounts and interest, finance charges, terms of repayment, and other specified conditions of loans. Subsection (c), in contrast, discusses interchange fees—but that section does not contain a preemption clause. Thus NCUA acts arbitrarily and capriciously when it describes 12 C.F.R. § 701.5 as "explicitly stating that FCUs may charge non-interest charges and fees and that state law limiting those charges are preempted," when that regulation does no such thing. 91 Fed. Reg. at 34,727. Indeed, NCUA's own reasoning reinforces that the Interim Rule does not preempt the IFPA when it admits that "[n]on-interest charges" regulated under the IFPA are merely "*closely related*" to the preempted subjects in 12 C.F.R. § 701.5(b), rather than actually being *covered* by them. 91 Fed. Reg. 34,726 n.8; *see also Raoul*, No. 1:24-cv-07307 (N.D. Ill.) Dkt. 29 at 5-6.

86. NCUA also fails to account for the fact that interchange fees in the United States currently are set at a supracompetitive rate, and that nothing in the Federal Credit Union Act authorizes the receipt of unlimited fees—fees far beyond what is necessary to compensate institutions for their lending and deposit activities—set by third parties. Again, the Interim Rule itself highlights that distinction by explaining that it protects "[b]usiness decisions regarding noninterest charges and fees permitted under this paragraph" that are "arrived at by each Federal credit union *on a competitive basis* and not on the basis of any agreement, arrangement, undertaking, understanding, or discussion with other financial institutions or their officers." 12 C.F.R. § 701.5(c)(3)(i) (emphasis added). Thus, again, the Interim Rule preamble's claim that the revised regulation preempts the IFPA is arbitrary and capricious, and a misinterpretation of its own regulation, because the IFPA applies only to network-set fees, not fees set by each federal credit union on a competitive basis. The NCUA also failed to consider whether interchange fees in the United States are reached on a competitive basis—they are not—so the rule's specific authorization of those network-set interchange fees is arbitrary and capricious.

87. NCUA also failed to consider whether the current amount of interchange fees are necessary to compensate federal credit unions, and ignored that financial institutions collect hundreds of billions in other fees and interest directly from card customers to compensate them for the credit and debit card activities. That is also arbitrary and capricious.

88. Nothing in the Interim Rule demonstrates that lower interchange fees—which will reduce merchant expenses and lower customer prices—will meaningfully deter consumers from using credit and debit cards. Financial institutions could just as well cut back on their own immense profits. Moreover, consumers around the world make widespread use of debit and credit cards despite interchange fees far lower than those that prevail in the United States. Financial institutions

also can avoid the IFPA by directly negotiating fees with merchants. And nothing in the IFPA prohibits those institutions from contracting with card networks if that is what they deem most efficient. Rather, in the process of regulating the fee-setting business of card networks, the IFPA reduces the interchange fee amount a financial institution receives if the institution allows the card networks to set the fees (as opposed to competitively setting the fees itself) by prohibiting fees on the tax and tip portions of a transaction.

89. NCUA did not consider any of the arguments above, despite referring to and relying on other filings in the *Raoul* litigation, when it issued its Interim Rule. Thus the Interim Rule is arbitrary and capricious.

90. NCUA's actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

**THIRD CAUSE OF ACTION**

**Violation of the APA: Procedurally Invalid Interim Rule**

91. The allegations in paragraphs 1–64 are expressly incorporated herein as if restated in full.

92. The APA requires that "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" before a rule goes into effect. 5 U.S.C. § 553(c).

93. The Interim Rule constitutes a "rule" within the meaning of the APA, 5 U.S.C. § 551(4) because it purports to provide a "statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."

94. NCUA did not provide prior notice before issuing the Interim Rule and did not conduct notice and comment procedures before the Interim Rule went into effect.

95. An agency may only dispense with the APA's notice and comment requirements if it finds, "for good cause," that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B).

96. In the Interim Rule, NCUA states that "prior notice and public comment are impracticable for this [Interim Rule] due to the abbreviated timeline between the February 2026 district court case and the effective date of the IFPA," leading to purported "significant uncertainty as to whether FCUs are required to comply with the IFPA" absent the Interim Rule. 91 Fed. Reg. 34,728.

97. NCUA's determination that prior notice and public comment were impracticable for the Interim Rule is erroneous. The impracticability exception is "to be narrowly construed and only reluctantly countenanced." *Mack Trucks, Inc.*, 682 F.3d at 93. This exception applies only where, for example, delay would "imminently threaten life or physical property." *Sorenson Commc'ns Inc.*, 755 F.3d at 706. "[S]ignificant uncertainty" does not suffice. *See* 91 Fed. Reg. 34,728. That a state law might reduce the amount of interchange fees banks and credit unions may receive, or that those institutions might incur costs in complying with that state law, does not meet this high bar.

98. Even if there had been an emergency, an "emergency of the agency's own making" cannot "constitute good cause" for avoiding notice-and-comment rulemaking. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 115 (2d Cir. 2018) (cleaned up). NCUA's alleged concerns arose from the Act's July 1, 2026 effective date, see 91 Fed. Reg. 34,728, but "statutory deadlines in and of themselves do not generally provide a basis for invoking . . . impracticability," *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1381 (Fed. Cir. 2017). Indeed, a "contrary rule would encourage administrative gamesmanship because an agency

. . . could simply wait until the eve of a statutory . . . deadline, then raise up the good cause banner and promulgate rules without following APA procedures." *Id.* (cleaned up). That is exactly what occurred here. In the Interim Rule, NCUA acknowledges that the IFPA was enacted on June 7, 2024, *see* 91 Fed. Reg. 34,729, and a year later, its effective date was delayed to July 1, 2026. Indeed, a little over a week before the NCUA issued its Interim Rule, the Illinois legislature voted to delay the IFPA's effective date yet again, to July 1, 2027. Thus, NCUA had nearly two years to promulgate a full notice-and-comment rule to address any "uncertainty" created by the Act, 91 Fed. Reg. 34,728—and also knew that it would soon have an additional year until the IFPA's effective date —but NCUA chose instead to promulgate the Interim Rule without notice and comment years into the litigation.

99. NCUA has therefore acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

100. NCUA's interim rule harms Plaintiffs, and Plaintiffs have no adequate remedy at law. In addition to purporting to be the basis of preempting a state law that would save Plaintiffs and their members millions in interchange fees, NCUA's actions deprived Plaintiffs of the opportunity to offer comments and input before the Interim Rule went into effect, thus depriving them of a meaningful chance to change the content of the Interim Rule before it went into effect.

## FOURTH CAUSE OF ACTION

### Declaratory Judgment

101. The allegations in paragraphs 1–64 are expressly incorporated herein as if restated in full.

102. An actual and justiciable controversy exists between Plaintiffs and NCUA over whether 12 C.F.R. § 701.5 preempts 815 ILCS 151/150-10 (the IFPA) as to federal credit unions.

103. NCUA states that the Interim Rule "is intended to preempt any state law affecting the non-interest charges and fees related to payment card services, including the IFPA." 91 Fed. Reg. 34,727.

104. NCUA's cited (revised) regulation does not preempt the IFPA. 12 C.F.R. § 701.5 contains preemption clauses in subsections (a) and (b), but only on topics that do not cover the IFPA: share accounts and interest, finance charges, terms of repayment, and other specified conditions of loans. Subsection (c), in contrast, discusses interchange fees—but that section does not contain a preemption clause. Thus, NCUA incorrectly interprets its own revised regulation when it describes § 701.5 as "explicitly stating that FCUs may charge non-interest charges and fees and that state law limiting those charges are preempted," when that regulation does not do the latter. 91 Fed. Reg. 34,727. Indeed, NCUA's own Interim Rule later acknowledges that it does not actually preempt the IFPA when it admits that "[n]on-interest charges" regulated under the IFPA are merely "*closely related*" to the preempted subjects in 12 C.F.R. § 701.5(b), rather than actually being *covered* by them. 91 Fed. Reg. 34,726 n.8. Thus, on its plain text, the NCUA's regulation does not preempt state laws from limiting interchange fees as applied to merchants and does not preempt the IFPA. NCUA's interpretation of its revised regulation to preempt the IFPA is wrong as a matter of law.

105. Moreover, the revised regulation empowers federal credit unions to charge interchange fees only insofar as they are "arrived at by each Federal credit union on a competitive basis and not on the basis of any agreement, arrangement, undertaking, understanding, or discussion with other financial institutions or their officers." 12 C.F.R. § 701.5(c)(3)(i). Interchange fees in the United States are not independently established by financial institutions through competitive decision-making; they are centrally established by card networks and accepted by agreement from

all card-issuing financial institutions. This is particularly true of interchange fees regulated by the IFPA, which are *only* those fees set centrally by credit card networks and not any interchange fee set by the card-issuing financial institution itself, such as fees resulting from a negotiation between a merchant and a credit union in competition with other credit unions. Thus, again, the NCUA's regulation does not preempt the IFPA and NCUA's interpretation of its revised regulation to preempt the IFPA is contrary to its plain text and/or an arbitrary and capricious determination of how its plain text applies to the fees regulated by the IFPA.

106. NCUA's actions deprive Plaintiffs of the protection and benefits of Illinois law and create present uncertainty about their rights.

107. A declaration will resolve that uncertainty and settle the parties' legal relations. Plaintiffs are entitled to a declaration that the Interim Rule does not preempt state laws regulating interchange fees, including the IFPA, and to a declaration that the Interim Rule does not apply to non-competitively-set fees and state laws regulating those fees (including the IFPA), and to further relief under 28 U.S.C. § 2201-02.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant relief and judgment as follows:

(A) Declare that the Interim Rule is unlawful in violation of the APA, that the Interim Rule does not preempt state laws regulating interchange fees, including the IFPA, and/or that the Interim Rule does not apply to fees that are not competitively set and state laws regulating those fees (including the IFPA).

(B) Vacate and set aside the Interim Rule.

(C) Enjoin Defendants from enforcing the Interim Rule.

(D) Award reasonable attorneys' fees and allowable costs, including under the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412.

(E) Grant Plaintiffs such other and further relief to which they are justly entitled at law and in equity.

Dated: November 12, 2026

Respectfully submitted,

*/s/ Mithun Mansinghani*

**Mithun Mansinghani**
OK Bar No. 32453 (active)
DC Bar No. 1010818 (inactive)
**Will Milam**
*Pro Hac Vice motion forthcoming*
LEHOTSKY COHN LLP
629 W. Main Street
Oklahoma City, OK 73102
(512) 693-8350
mithun@lehotskycohn.com
wmilam@lehotskycohn.com

**Michael B. Schon**
DC Bar No. 989893 (active)
**Rick W. Eberstadt**
DC Bar No. 1601996 (active)
*Pro Hac Vice motion forthcoming*
**Jack Heise**
*Pro Hac Vice motion forthcoming*
**Jonathan E. DeWitt**
DC Bar No. 90004853 (active)
*Pro Hac Vice motion forthcoming*
LEHOTSKY COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
mike@lehotskycohn.com
rick@lehotskycohn.com
jack@lehotskycohn.com
jdewitt@lehotskycohn.com